IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

ARDEN BAUER,

              Plaintiff,

vs.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

              Defendant.

Case No. 21-CV-2008-KEM

**MEMORANDUM OPINION
AND ORDER**

———————————

# Table of Contents

I.   *DISCUSSION* ................................................................ 2

  A.  *Interpretation of the FVRA* ........................................ 4

    1.  **Did the President direct Berryhill to serve as Acting Commissioner?** ........... 4

    2.  **Did Berryhill's service as Acting Commissioner exceed the FVRA's time limitations?** ................................................. 6

    3.  **Did the FVRA bar Berryhill from ratifying the ALJ's appointment?** ......... 18

  B.  *Constitutionality of the FVRA* ...................................... 20

    1.  *Length of Acting Service* ........................................ 20

    2.  **May Acting Officers Who Are Not Principal Officers Appoint Inferior Officers?** ................................................. 29

II.   *CONCLUSION* ............................................................ 37

Plaintiff Arden Bauer challenges Nancy Berryhill's July 2018 ratification of the appointment of Social Security ALJs from her position as Acting Commissioner of Social Security. Bauer argues that Berryhill's acting service violated the Federal Vacancies Reform Act of 1978 (FVRA) and the Appointments Clause of the United States Constitution. Bauer raises complex and novel arguments—particularly regarding the Appointments Clause—but I ultimately decline to strike down Berryhill's ratification of the ALJ's appointment here.[1]

## I. DISCUSSION

The Appointments Clause of the United States Constitution governs how "officers" of the United States are hired (as opposed to employees, who are not subject to any constitutional restrictions).[2] The Appointments Clause further divides officers into two categories: principal officers and inferior officers.[3] Principal officers (sometimes referred to by the shorthand PAS officers) must be nominated by the President and confirmed by the Senate; examples include ambassadors, Supreme Court justices, and cabinet secretaries.[4] Inferior officers may be appointed in the same manner, but if Congress authorizes, they may also be appointed by the President alone, a court of law, or a department head.[5]

---

[1] This order addresses the arguments raised in supplemental briefing (Docs. 28-30); the merits of Bauer's main appeal will be addressed by separate order.

[2] **U.S. Const. art. II, § 2, cl. 2**.

[3] *Id.*; *see also* **Morrison v. Olson**, 487 U.S. 654, 670 (1988).

[4] **U.S. Const. art. II, § 2, cl. 2**; *Freytag v. Comm'r,* 501 U.S. 868, 886-87 (1991).

[5] **U.S. Const. art. II, § 2, cl. 2**.

Case 6:21-cv-02008-KEM   Document 31   Filed 07/25/22   Page 2 of 37

Bauer argues that the ALJ's appointment to that position violated the Appointments Clause. The parties agree that Social Security ALJs are inferior officers who must be appointed by the president, a court of law, or a department head. They disagree on whether the ALJ here was appointed by a valid department head.

For a long time, Social Security ALJs were treated as employees who were not subject to the Appointments Clause. Thus, when the ALJ in this case was originally hired (in 2016 or 2017),[6] it was not by a department head. Things changed after the Supreme Court held in *Lucia v. SEC* that Securities and Exchange Commission ALJs are officers under the Appointments Clause (based on reasoning equally applicable to Social Security ALJs).[7] Shortly thereafter, on July 16, 2018, Nancy Berryhill, purporting to be the Acting Commissioner of the Social Security Administration under the FVRA, ratified the appointments of all Social Security ALJs.[8] Bauer's ALJ hearings were held in April and June 2020, after Berryhill's ratification. Doc. 19.

Bauer raises both statutory and constitutional arguments to Berryhill's acting service. Bauer argues that the FVRA did not authorize Berryhill to serve as the Acting Commissioner and ratify the ALJ's appointment. And even if the FVRA authorized Berryhill's actions, Bauer argues they violated the Appointments Clause. Thus, Bauer argues that because Berryhill's ratification is invalid under the FVRA or the Appointments Clause, the ALJ was not appointed by a department head as required by the Appointments Clause.

---

[6] *See* Doc. 28 at 2.

[7] 138 S. Ct. 2044 (2018).

[8] *See* **Richard J. M. v. Kijakazi**, No. 19-cv-827 (KMM), 2022 WL 959914, at *4 (D. Minn. Mar. 30, 2022), *appeal filed sub nom. Messer v. Kijakazi*, No. 22-2127 (8th Cir. May 27, 2022).

3

### A. Interpretation of the FVRA

Bauer argues that Berryhill's acting service violated the FVRA for two reasons: (1) the President did not "direct" Berryhill's service and (2) at the time she ratified the ALJ's appointment, Berryhill's acting service exceeded the FVRA's time limits. In addition, Bauer argues that even if the FVRA authorized Berryhill's acting service, the FVRA's antiratification provision barred Berryhill from ratifying the ALJ's appointment.

### 1. Did the President direct Berryhill to serve as Acting Commissioner?

The Commissioner of Social Security heads the Social Security Administration. The parties agree that the Commissioner is a "Head[] of Department[]" and principal officer under the Appointments Clause who must be appointed by the President and confirmed by the Senate.[9] When such a person "dies, resigns, or is otherwise unable to perform the functions and duties of the office," the FVRA sets out who may "perform the functions and duties of the vacant office temporarily in an acting capacity, subject to" certain time limits.[10]

The "who" is set out in 5 U.S.C. § 3345. The FVRA provides (1) that the "first assistant . . . shall" serve in an acting capacity, or (2) that "the President (and only the President) may direct" certain people to serve in an acting capacity, including an officer or employee of the agency.[11]

On January 20, 2017, former Acting Commissioner Carolyn Colvin resigned in conjunction with the inauguration of President Trump.[12] Colvin had become the Acting

---

[9] *See also* **42 U.S.C. § 902(a)(1)**.

[10] **5 U.S.C. § 3345(a)**.

[11] *Id.*

[12] *Richard J.M.*, 2022 WL 959914, at *3.

Commissioner by nature of her position as the Deputy Commissioner, the "first assistant" to the Commissioner.[13] Her resignation left vacancies in both the Commissioner and Deputy Commissioner positions. Berryhill, as the Deputy Commissioner for Operations,[14] was next in line to serve as Acting Commissioner under former President Obama's December 2016 memorandum providing an order of succession for Social Security officials to serve as Acting Commissioners under the FVRA.[15]

Bauer argues that because President Trump did not issue the succession memo, he did not "direct" Berryhill's service under the FVRA. The Government argues that the succession memo remained in effect unless and until President Trump revoked it. I agree. Executive orders, another form of presidential directive, remain in effect through different presidencies (until they are replaced, modified, or revoked or they lapse by their terms).[16] The President's power to issue executive orders comes from Article II of the Constitution, which generally vests executive power in the President.[17] This executive

---

[13] *See id.*; **42 U.S.C. § 902(b)(4)**.

[14] The Deputy Commissioner for Operations is not a principal officer, and Berryhill was not appointed by the President and confirmed by the Senate to that position.

[15] Presidential Memorandum Providing an Order of Succession Within the Social Security Administration, **81 Fed. Reg. 96337** (Dec. 23, 2016). President Obama's memo explicitly cited the FVRA and not 42 U.S.C. § 902(b)(4), a statute specific to the Social Security Administration that provides "[t]he Deputy Commissioner shall be Acting Commissioner . . . during the absence or disability of the Commissioner and, unless the President designates another officer of the Government as Acting Commissioner, in the event of a vacancy in the office of the Commissioner."

[16] *See* Benjamin Wilheim, **Cong. Rsch. Serv.**, **IF11358**, Presidential Directives: An Introduction (2019), available at https://crsreports.congress.gov/product/pdf/IF/IF11358; *see, e.g.*, *Indigenous Env't Network v. Trump*, 428 F. Supp. 3d 296, 301 (D. Mont. 2019) (noting that executive order from 2004 remained in effect until revoked by executive order issued in 2019).

[17] *See **Bldg. & Constr. Trades Dep't, AFL-CIO v. Allbaugh***, 295 F.3d 28, 32-33 (D.C. Cir. 2002).

5

power includes the power to oversee executive agencies like the Social Security Administration[18] and is the same basis for the President's ability to issue the succession memo here. I have found nothing indicating that presidential memoranda are treated differently than executive orders in terms of when they lose effect.

Accordingly, I agree with the Government that President Trump "directed" Berryhill's service as Acting Commissioner by nature of the succession memo issued by President Obama that was still in effect at the time of Colvin's resignation.

### 2. *Did Berryhill's service as Acting Commissioner exceed the FVRA's time limitations?*

Berryhill purported to become Acting Commissioner on January 20, 2017, by nature of the succession memo and Colvin's resignation as Acting Commissioner. Berryhill continued to use the "Acting Commissioner" title until March 6, 2018, when the United States Government Accountability Office (GAO) issued a report indicating that Berryhill's acting service violated the time limits set out in the FVRA.[19] The report indicated that the FVRA generally limits acting service to 210 days but that for vacancies during a presidential transition, "that time period is extended to 300 days after the vacancy occurs" or after the inauguration date, whichever is later.[20] Thus, the report concluded that Berryhill's acting service ended on November 16, 2017, 300 days after both Colvin's resignation and President Trump's inauguration.[21] The report stated that

---

[18] *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492-93 (2010).

[19] GAO, Letter on *Violation of the Time Limit Imposed by the Vacancies Reform Act of 1998— Commissioner, Social Security Administration*, B-329853 (Mar. 6, 2018), available at https://www.gao.gov/assets/b-329853.pdf [hereinafter GAO Letter].

[20] *Id.*; **5 U.S.C. § 3349a**.

[21] **GAO Letter**, *supra* note 19.

6

going forward, Berryhill could not use the title Acting Commissioner, although she could perform "the delegable functions and duties of the Commissioner position."[22]

Berryhill continued to lead the Social Security Administration using the title "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security."[23] No one served as Acting Commissioner until President Trump nominated Andrew Saul as the Commissioner of Social Security on April 17, 2018.[24] Following Saul's nomination, Berryhill purportedly resumed serving as Acting Commissioner under a provision of the FVRA that authorizes acting service while a nomination is pending. Berryhill ratified the appointment of the Social Security ALJs on July 16, 2018, while Saul's nomination was first pending.[25]

Section 3346 sets out time limits for acting service under the FVRA:

(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

(1) for no longer than 210 days beginning on the date the vacancy occurs; or

(2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

---

[22] *Id.*

[23] *See, e.g.*, **Extension of Expiration Dates for Two Body System Listings, 83 Fed. Reg. 13862** (Apr. 2, 2018) (Berryhill signed notice in Federal Register).

[24] *Richard J. M.*, 2022 WL 959914, at *4.

[25] *See id.* Saul was confirmed by the Senate in June 2019, prior to the ALJ hearing in this case, but there is no evidence that he ratified the ALJ's appointment.

7

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—
    (A) until the second nomination is confirmed; or
    (B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.[26]

As noted by the GAO, a special rule applies to vacancies during presidential transitions:

(a) In this section, the term "transitional inauguration day" means the date on which any person swears or affirms the oath of office as President, if such person is not the President on the date preceding the date of swearing or affirming such oath of office.
(b) With respect to any vacancy that exists during the 60-day period beginning on a transitional inauguration day, the 210-day period under section 3346 . . . shall be deemed to begin on the later of the date occurring—
    (1) 90 days after such transitional inauguration day; or
    (2) 90 days after the date on which the vacancy occurs.[27]

Here, the parties agree that Berryhill's 300 days of service from January 20 to November 16, 2017, was in accordance with the FVRA. They dispute whether § 3346(a)(2), allowing acting service while a nomination is pending, applies after the initial 210-day time limit has already run (springing the Acting Commissioner back into service), or whether it applies only when the nomination occurs during the initial 210-day period of acting service.[28]

---

[26] **5 U.S.C. § 3346(a)-(b).**

[27] **5 U.S.C. § 3349a.**

[28] I note that it could be argued that "the date the vacancy occurred" for purposes of § 3345(a)(1) was in February 2013, when Michael Astrue's six-year term as Commissioner expired; from that time, the Commissioner position remained vacant, with Deputy Commissioner Colvin performing the Commissioner's duties as Acting Commissioner. *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 951 (D. Md. 2020) (noting that the FVRA was enacted to "ma[k]e clear that the timing provision—which sets the default maximum length of acting service at 210 days—begins to run from the date the vacancy arises, rather than the date when the acting official

8

The vast majority of courts have held (as the Government advocates) that § 3346(a)(2) "contains a 'spring-back' provision that enabled [Berryhill] to resume her role as Acting Commissioner as of the date that Andrew Saul was nominated for Commissioner in April 2018."[29] As noted by the District of Minnesota in *Richard J.M.*, however, most of these cases addressed the issue briefly (many in a single paragraph) and did not "engage in [a] searching and thorough statutory analysis."[30]

In *Richard J.M.* and *Brian T.D.*, two different courts for the District of Minnesota recently held that § 3346(a)(2) is a tolling provision that applies only when the nomination is made before the initial 210-day time limit in (a)(1) has expired.[31] These courts relied heavily on the use of "serving" in the first part of § 3346(a):

---

assumes office"). This interpretation would not necessarily be a death knell for the Government, as the Government's "springboard" argument could apply even if the 210-day period elapsed much earlier in time (i.e., in 2013), since Saul's nomination was only the second (with Colvin's being the first). Ultimately, I decline to address this issue and proceed on the assumption that Berryhill's service from January 20 to November 16, 2017, did not violate the FVRA's time limits, as the parties have agreed.

[29] *Williams v. Kijakazi*, No. 1:21-CV-141-GCM, 2022 WL 2163008, at *3 & n.3 (W.D.N.C. June 15, 2022) (collecting cases); *see also Brooks v. Kijakazi*, No. 1:21CV609, 2022 WL 2834345, at *23 (M.D.N.C. July 20, 2022) (report and recommendation); *Nwobi v. Kijakazi*, No. 3:21-CV-00539-KDB, 2022 WL 2293358, at *3 (W.D.N.C. June 24, 2022).

[30] *Richard J. M.*, 2022 WL 959914, at *9. The same goes for a 1999 memorandum issued by the Office of Legal Counsel providing that the "acting officer is again able to perform the functions and duties of the office as of the date the nomination is submitted," "even if the 210-day period expired before that nomination was submitted." Guidance on Application of the Federal Vacancies Reform Act of 1998, **23 Op. O.L.C. 60, 68** (1999).

[31] *Richard J.M.*, 2022 WL 959914, at *8; *Brian T.D. v. Kijakazi*, No. 19-cv-2542 (DTS), 2022 WL 179540, at *9 (D. Minn. Jan. 20, 2022) (to be published in the Federal Supplement, third series).

9

Congress, in enacting § 3346, used the present participle "serving," rather than the past or present perfect "served" or "has served." Section 3346(a) applies to "the person serving as an acting officer" under § 3345. By its terms, then, the section applies to the person presently serving in that capacity and not to a person who had previously served as Acting Commissioner. Berryhill was "the person serving as an acting officer" from January 20, 2017[,] until November 16, 2017[,] when her term expired. When Saul was first nominated to become Commissioner on April 17, 2018, Berryhill was not then serving as Acting Commissioner and Saul's nomination did not create a new vacancy. Therefore, by its plain language, § 3346(a)(2) does not apply to Berryhill because she was not serving as Acting Commissioner when Saul was nominated.[32]

Subsection (a) refers to "the person serving as an acting officer as described under section 3345." Thus, "serving" is used to refer back to section 3345, which sets out who may serve as an acting officer (first assistants or certain other people directed by the President). While § 3345 provides who may serve as an acting officer, § 3346 sets the periods of time during which such persons may serve in that role. Significantly, the active verb in § 3346(a) is not serving, but "may serve": "the person . . . may serve" subject to the time limits set out in subsections (a)(1) and (a)(2). By using "may serve," Congress did not convey that the person had to be currently serving for the nomination rule in subsection (a)(2) to apply ("the person . . . may serve . . . once a . . . nomination . . . is submitted . . . from the date of such nomination for the period that the nomination is pending"). Indeed, "serving" is used in subsection (a) generally (not (a)(2) specifically), and the District of Minnesota's reasoning would apply with equal force to subsection (a)(1). If the use of "serving" in subsection (a) means the person must be currently serving at the time of the nomination ("the person serving . . . from the date of such nomination"), it also means the person must be currently serving at the time of the

---

[32] **Brian T.D.**, 2022 WL 179540, at *11 (footnote omitted).

vacancy ("the person serving . . . on the date the vacancy occurs"). This makes no sense.

*Brian T.D.* and *Richard J.M.* also relied on the use of "continue to serve" in subsection (b), which addresses time limits after a nomination is rejected by the Senate. I agree that by stating a person may "continue to serve" for an additional 210 days after the Senate rejects a nomination, Congress suggested that the person must have been serving while the nomination was pending, before the Senate rejected the nomination. But this does not speak to the current situation, as the Senate had not rejected Saul's nomination and it was currently pending when Berryhill ratified the ALJ's appointment. *Brian T.D.* further reasoned:

> Subsection (b)(2) states that if a second nomination is unsuccessful, "the person *serving* as the acting officer may *continue to serve*." . . . There is no good reason for construing the word "serving" when used in the first paragraph of § 3346(a) differently than when it is used in § 3346(b).[33]

But as noted above, serving is not the active verb in subsection (a), "may serve" is. It is a principle of statutory interpretation that when interpreting different parts of the same statute, "differences in language . . . convey differences in meaning."[34] Thus, if anything, Congress's use of "continue to serve" in subsection (b) but not subsection (a) supports the Government's interpretation.

*Brian T.D.* and *Richard J.M.* found significant the use of "or" instead of "and" connecting subsections (a)(1) and (a)(2). The court in *Brian T.D.* reasoned:

---

[33] *Id.* at *11 (citations omitted) (quoting **5 U.S.C. § 3346(b)(2)**).

[34] *Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (quoting *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017)); *see also* **Union Pac. R.R. Co. v. United States**, 865 F.3d 1045, 1049-50 (8th Cir. 2017) ("[D]ifferences in statutory language convey differences in meaning. And when Congress does not adopt obvious alternative language, the nature implication is that it did not intend the alternative." (citations omitted)).

11

The word "or" modifies the entire provision that limits the acting officer to a period "no longer than" 210 days from the date the vacancy arose. Thus, when read with the entirety of subsection (a)(1) "or" serves to suspend that time limitation, not to create an entirely separate and distinct period of service.

A person serving as an acting officer may do so "for no longer than 210 days beginning on the date the vacancy occurs; *or* . . . once a first or second nomination for the office is submitted to the Senate," during the pendency of that nomination. The ordinary usage of the word "or" is disjunctive, indicating an alternative. In this statute "or" serves to provide an alternative *length* of service not to create a series of non-contiguous periods of service. If the statute were read to create three distinct periods of service—the initial 210 days, the first nominee period, and the second nominee period—the statute would have used the word "and" to separate the three periods of service.

Construing the word "or" to mean "and," as Defendant argues for here, is conjunctive and "clearly in contravention of its ordinary usage." The plain reading and ordinary usage of the word "or" in § 3346(a) is that a person serving as Acting Commissioner may serve for a 210-day period from the start of the vacancy, *or* if the person is already "serving as acting officer" according to the FVRA, may continue serving during the pendency of a timely nomination. The 210-day period is a limitation on Berryhill's acting service and after the 210-day limitation had expired, she could not later return to acting service, turning § 3346's "or" into an "and."[35]

*Brian T.D.* relied on the Eighth Circuit's decision in *United States v. Smith*. In that case, the court interpreted a statute that stated when a person admitted to lying under oath, they could not be prosecuted for perjury if at the time of the admission, "the declaration has not substantially affected the proceeding, or it has not become manifest that such falsity has been or will be exposed."[36] The Eighth Circuit held it was error for the trial court to require the person to prove both that the statement had no effect and that the person's

---

[35] 2022 WL 179540, at *13 (citations omitted) (quoting **5 U.S.C. § 3346(a)**; ***United States v. Smith***, 35 F.3d 344, 346 (8th Cir. 1994)).

[36] ***Smith***, 35 F.3d at 345.

lie would not have been exposed.[37]  But the court did not hold that if both alternatives were present—i.e, that the person's lie both had no effect and would not have been discovered—then the person could be prosecuted.  In *Smith*, the "or" functioned as a disjunctive signaling two alternatives, but not that those two alternatives were mutually exclusive.

> The ordinary meaning of "or," as used disjunctively, is not to indicate an exclusive alternative—that is, one or the other but not both. At least, that is not the only ordinary usage of the word "or." Rather, the word "or" "can be used in both an 'inclusive' sense ('A or B [or both]') and an 'exclusive' sense ('A or B [but not both]')."  By way of illustration, the United States Court of Appeals for the Eleventh Circuit has offered the following example:
>
>> Compare the phrase, "if you are a husband or a father, you'll understand," with, "you may eat an apple or an orange." In the first example, the or is probably inclusive (people who are both husbands and fathers will probably understand, too), but in the second, it is probably exclusive (you are probably not allowed to eat both fruits).
>
> But, while the meaning of "or" will always depend on the context of its use, and "both senses of 'or' are commonly used," "the inclusive use of 'or' is the more common."[38]

*Brian T.D.* and *Richard J.M.* reasoned that the "or" renders subsections (a)(1) and (a)(2) mutually exclusive.  This reasoning is certainly valid (why not use "and"?).  But I am less convinced.  Congress did not qualify the use of "or" with "either," which tends

---

[37] ***Id.*** at 345-46.

[38] *Allstate Ins. Co. v. Plambeck*, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014) (citations omitted) (quoting *Shaw v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 605 F.3d 1250, 1254 n.8 (11th Cir. 2010); *B-50.com, LLC v. InfoSync Servs., LLC,* No. 3:10-cv-1994-D, 2014 WL 285096, at *7 (N.D. Tex. Jan. 27, 2014)).  I further note that in formal logic, "or" is used in the inclusive sense.  *See* **Logical Disjunction**, Wikipedia, https://en.wikipedia.org/wiki/Logical_disjunction (last visited July 21, 2022).

13

to indicate that the alternatives are mutually exclusive.[39]  In addition, if subsections (a)(1) and (a)(2) were mutually exclusive, a person could serve for the initial 210 days, or they could serve during the pendency of a nomination, but not both.  But no court disputes that a person can serve both for the initial 210 days and while a nomination is pending; rather, *Brian T.D.* and *Richard J.M.* held that a person can serve during the pendency of a nomination under subsection (a)(2) only if they were currently serving the initial 210-day term under subsection (a)(1).  This reads language into the statute that does not exist (even when "or" is construed as an exclusive disjunction).

*Brian T.D.* and *Richard J.M.* viewed subsection (a) as setting out when acting service **must end**, rather than setting out when acting service **is allowed**.  Thus, under their reading, when the nomination occurs within the initial 210-day time limit, the time limit in subsection (a)(1) never elapses, and therefore subsection (a)(2) governs the length of acting service; but when the nomination occurs after 210 days, subsection (a)(1) has already run and subsection (a)(2) cannot apply.  Consider the following example:  The Commissioner resigns, and the Deputy Commissioner automatically takes over as the Acting Commissioner by virtue of being the first assistant.  After 100 days, the President nominates a new Commissioner.  According to *Brian T.D.* and *Richard J.M.*, the Deputy Commissioner's initial 100 days of acting service did not occur under subsection (a)(1), and now the length of service is governed by subsection (a)(2); but if the nomination had occurred on the 211th day of acting service, the time limits in subsection (a)(1) would have already elapsed, and thus, subsection (a)(2) cannot apply.  I find this reading incongruous with the statutory text, which sets out when an officer "may serve," not when that service must end.  In the example, the better reading is that the Deputy Commissioner served as the Acting Commissioner under subsection (a)(1) during the

---

[39] *See Allstate Ins.*, 66 F. Supp. 3d at 788.

14

initial 100 days, and the Deputy Commissioner served as the Acting Commissioner under subsection (a)(2) during the pendency of the nomination. Thus, the statute's use of "or" does not demonstrate that subsections (a)(1) and (a)(2) are mutually exclusive. As the Western District of North Carolina recently reasoned:

> By using the disjunctive "or," the FVRA provides for acting service during either or both of two periods: (1) for 210 days after the vacancy, or (2) during the pendency of a first or second nomination. It provides a single trigger for permissible service during a first or second nomination's pendency: the submission of the nomination. Thus, under § 3346(a)(2)'s plain text, "once" [Saul's] "nomination for the office" of Commissioner "[wa]s submitted to the Senate," [Berryhill] could serve "for the period that the nomination [wa]s pending in the Senate."

> Tellingly, the actual text of the statute does not mention any requirement that a nomination be submitted within the initial 210-day period. The statute simply says that "*once* a first or second nomination . . . is submitted," the acting official designated under the FVRA may serve "for the period that the nomination is pending." Congress certainly could have chosen to condition such service on the submission of a nomination within 210 days, but it did not. The Court must "resist reading words . . . into a statute that do not appear on its face."[40]

I find that the plain language of the statute authorizes acting service in two instances: during the initial 210 days after a vacancy is created, and while a nomination is pending. And nothing in the statute requires that the nomination be made during the initial 210-day period for subsection (a)(2) to apply. Thus, I find that the plain language of the FVRA allowed Berryhill's acting service during the pendency of Saul's

---

[40] ***Williams***, 2022 WL 2163008, at *3 (citations omitted) (quoting **5 U.S.C. § 3346(a)**; ***Dean v. United States***, 556 U.S. 568, 572 (2009)). In addition, after this court had a draft of this opinion completed, a court for the Middle District of North Carolina issued an opinion and recommendation rejecting the reasoning of *Brian T.D.*, employing largely the same statutory-interpretation analysis as I do here. ***Brooks***, 2022 WL 2834345, at *16-20.

nomination, even though the initial 210-day period had elapsed at the time of the nomination.

I briefly address other considerations. *Brian T.D.* and *Richard J.M.* noted that their alternative interpretation of the FVRA incentivized the President to make prompt nominations.[41] But the "spring back" theory also incentivizes the President to make nominations, since it allows immediate acting service (rather than waiting for Senate confirmation if the initial 210-day period has expired).

The legislative history also supports the "spring back" interpretation (although as the court noted in *Brian T.D.*, a court "need not consult extratextual sources when the meaning of a statute's terms is clear").[42] The Senate committee report from July 1998 makes clear that an "acting officer may serve even if the nomination is submitted after the [210] days has passed although . . . the acting officer may not serve between the [210th] day and the day the nomination is submitted."[43] The language of the proposed § 3346(a) discussed in the committee report is the same as the language that was ultimately adopted (other than changing 150 days to 210 days).[44] But as the court noted in *Brian T.D.*, the proposed language of § 3348(b) discussed in the committee report differs from what was ultimately adopted.[45] At the time of the committee report, § 3348(b)(1) provided that "if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs[,] . . . the office shall remain vacant until the President submits a first nomination to the

---

[41] ***Richard J.M.***, 2022 WL 959914, at *8.

[42] 2022 WL 179540, at *14 (quoting ***McGirt v. Oklahoma***, 140 S. Ct. 2452, 2469 (2020)).

[43] **S. Rep. No. 105-250**, at 14 (1998).

[44] *See **id.*** at 25.

[45] *See **id.*** at 27.

Senate."[46]   As ultimately adopted, § 3348(b)(1) provides that "[u]nless an officer or employee is performing the functions and duties in accordance with [the FVRA], if" a principal officer "dies, resigns or is otherwise unable to perform the functions and duties of the office[,] . . . the office shall remain vacant."[47]   The Congressional Record contains an explanation for this change from one of the FVRA's Senate sponsors (in October 1998):

> Changes were made to § 3348(b) to provide that the vacant office provisions of the legislation apply not only when an acting officer has served more than 210 days without a nomination for the office having been submitted to the Senate, but also prior to the 210 days after the vacancy occurs unless an officer of [sic] employee performs the functions of the vacant office in accordance with [the FVRA].[48]

The legislative history from October 1998, after the text of § 3348(b)(1) was changed, continues to support that subsection (a)(2) applied when a nomination was pending, even if the initial 210-day period had already run at the time of the nomination.[49]

Overall, here, I find that both the text of the statute and the legislative history support that Berryhill's acting service was valid under the FVRA during the pendency of

---

[46] *Id.*

[47] **5 U.S.C. § 3348(b)(1)**.

[48] **144 Cong. Rec. 27,497** (1998).

[49] *See id.* (noting that to "address[] the situation when the 210 day service period for an acting officer expires without a nominee having been submitted to the Senate, and the 211th day occurs during a Senate recess," § 3349d was added, which allows acting service based on the President notifying the Senate of the intent to nominate someone once the Senate reconvenes "to avoid the vacant office provisions of § 3348 from taking effect"); *id.* at 27,498 (noting that for those concerned with the enforcement provision, "it is not so stringent that it will result in governmental paralysis," as "the language of the legislation is crafted in such a way as to allow for the filling of a vacant office once the President submits a nomination to the Senate").

17

Saul's nomination. Thus, the FVRA authorized Berryhill to serve as Acting Commissioner at the time she ratified the ALJ's appointment in July 2018.

### 3. Did the FVRA bar Berryhill from ratifying the ALJ's appointment?

The FVRA's enforcement mechanism provides:

> (1)
> An action taken by any person who is not acting under [the FVRA] in the performance of any function or duty of a vacant office to which this section and [other sections of the FVRA] apply shall have no force or effect.
> (2)
> An action that has no force or effect under paragraph (1) may not be ratified.[50]

Bauer argues that because Social Security Administration staff hired the ALJ who presided over his hearing, they took action in violation of the FVRA, and therefore, that action cannot be ratified. Bauer notes the ALJ who presided over his hearing was appointed in late 2016 or early 2017, when the Commissioner position was vacant and either Colvin or Berryhill served as Acting Commissioner. Bauer does not argue that Colvin's acting service violated the FVRA, nor that Berryhill's initial service violated the FVRA. Thus, Bauer argues that despite a valid Acting Commissioner, Social Security staff performed a function or duty of the vacant office when they hired the ALJ, and thus, the antiratification provision of the FVRA applies.

"Function or duty" for purposes of § 3348 (containing the antiratification provision) is defined as a function or duty that is required by *statute* or *regulation* to be performed by the vacant officer position.[51] Here, no statute or regulation required that the Commissioner of Social Security appoint ALJs; rather, the Supreme Court held in

---

[50] **5 U.S.C. § 3348(d)**.

[51] **5 U.S.C. § 3348(a)(2)**.

Case 6:21-cv-02008-KEM   Document 31   Filed 07/25/22   Page 18 of 37

June 2018 that the Constitution required that the Commissioner of Social Security appoint ALJs.  When Social Security staff hired the ALJ here, they were not purporting to act as the agency head; rather, at that time, the Social Security Administration did not believe that ALJs were inferior officers subject to the Appointments Clause.  If a statute or regulation had made it clear at the time of the ALJ's hiring that ALJs must be appointed by an agency head, Colvin or Berryhill likely would have appointed the ALJ here. Because there was a valid Acting Commissioner at the time of the ALJ's appointment, enforcing the antiratification provision would not serve its purpose of ensuring compliance with the FVRA.  And indeed, by its clear terms (including the definition of "function or duty"), the antiratification provision does not apply.

"Ratification can remedy defects arising from the decisions of improperly appointed officials."[52]  In *Edmond v. United States*, the Supreme Court held that after it suggested military judges were inferior officers subject to the Appointments Clause, the Secretary of Transportation, as the department head, could ratify the appointments of military judges originally hired by a lower officer.[53]   Here, as in *Edmond*, the unconstitutionality of the ALJ's appointment could be rectified through ratification by a department head.  The FVRA authorized Berryhill to serve as the Acting Commissioner of the Social Security Administration, and its antiratification bar did not apply.  The issue now is whether Berryhill's service and ratification was in accord with the Appointments Clause.

---

[52] *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017).

[53] *Edmond v. United States*, 520 U.S. 651, 654, 666 (1997); *see also Wilkes-Barre Hosp.*, 857 F.3d at 370-71 (upholding the NLRB's ratification of the appointment of a regional director, even though the regional director's original appointment violated the Constitution (he had been appointed by a different makeup of the Board, and the Supreme Court later held that three of the five members of that Board were appointed in violation of the Recess Appointments Clause)).

## B. Constitutionality of the FVRA

Bauer argues that even if the FVRA authorized Berryhill to ratify the ALJ's appointment, the FVRA is unconstitutional under the Appointments Clause. First, Bauer argues that although acting service may be constitutional under certain limited circumstances, here, the length and nature of Berryhill's acting service exceeded the bounds allowed by the Constitution. Second, the Appointments Clause requires inferior officers like ALJs to be appointed by a department head, who is ordinarily a principal officer nominated by the President and confirmed by the Senate. Bauer argues that the FVRA is unconstitutional to the extent it allows an acting department head who is not a principal officer to appoint inferior officers.

### 1. Length of Acting Service

The Supreme Court recently set out the history of statutes authorizing acting service:

> Since President Washington's first term, Congress has given the President limited authority to appoint acting officials to temporarily perform the functions of a vacant PAS office without first obtaining Senate approval. The earliest statutes authorized the appointment of "any person or persons" to fill specific vacancies in the Departments of State, Treasury, and War. Congress at first allowed acting officers to serve until the permanent officeholder could resume his duties or a successor was appointed, but soon imposed a six-month limit on acting service [in 1795].
>
> Congress revisited the issue in the 1860s, ultimately passing the Vacancies Act of 1868. The Vacancies Act expanded the number of PAS offices that the President could fill with acting officers. With that expansion came new constraints. The authority to appoint "any person or persons" as an acting officer gave way to a default rule that the "first or sole assistant shall" perform that function, with an exception allowing the President to instead fill the post with a person already serving in a PAS office. And rather than six months of acting service, the Vacancies Act generally

authorized only ten days.  That narrow window of acting service was later lengthened to 30 days [in 1891].

During the 1970s and 1980s, interbranch conflict arose over the Vacancies Act. The Department of Justice took the position that, in many instances, the head of an executive agency had independent authority apart from the Vacancies Act to temporarily fill vacant offices. The Comptroller General disagreed, arguing that the Act was the exclusive authority for temporarily filling vacancies in executive agencies.  Congress then amended the Vacancies Act [in 1988] to clarify that it applies to such agencies, while at the same time lengthening the term of permissible acting service to 120 days, with a tolling period while a nomination is pending.

But tensions did not ease. By 1998, approximately 20 percent of PAS offices in executive agencies were occupied by "temporary designees, most of whom had served beyond the 120-day limitation period without presidential submissions of nominations." These acting officers filled high-level positions, sometimes in obvious contravention of the Senate's wishes. One, for instance, was brought in from outside Government to serve as Acting Assistant Attorney General for the Civil Rights Division of the Justice Department, immediately after the Senate refused to confirm him for that very office.  Perceiving a threat to the Senate's advice and consent power, Congress acted again.  In 1998, it replaced the Vacancies Act with the FVRA.[54]

In addition to early statutes authorizing acting service, the Supreme Court upheld the constitutionality of acting service against an argument that it violated the Appointments Clause in 1898.[55]  In *United States v. Eaton*, the consul general to Siam, a principal officer, fell terminally ill and was unable to perform the duties of the office.[56] The vice consul would ordinarily serve as the acting consul general, but the vice consul had been nominated but not confirmed and was not in Siam.[57]  In such circumstances, the

---

[54] ***NLRB v. SW. Gen., Inc.***, 137 S. Ct. 929, 935-36 (2017) (cleaned up).

[55] ***United States v. Eaton***, 169 U.S. 331, 336, 343 (1898).

[56] ***Id.*** at 331.

[57] ***Id.*** at 331-32, 337.

consul general was authorized by statute to appoint someone to be the vice consul to temporarily perform the consul general's duties (the statute did not set out an express time limit on this acting service).[58]  Thus, the consul general appointed someone to act in his stead, and this person served from July 12, 1892, when the consul general left for the United States, to May 18, 1893, when the Senate confirmed the nominated vice consul (for a total of 310 days, or a little more than ten months).[59]  The Supreme Court rejected the argument that temporary acting service of a principal-officer position violated the Appointments Clause, stating:

> The claim that congress was without power to vest in the president the appointment of a subordinate officer called a 'vice consul,' to be charged with the duty of temporarily performing the functions of the consular office, disregards both the letter and spirit of the constitution. Although section 2 of article 2 of the constitution requires consuls to be appointed by the president 'by and with the advice and consent of the senate,' the word 'consul' therein does not embrace a subordinate and temporary officer like that of vice consul, as defined in the statute. The appointment of such an officer is within the grant of power expressed in the same section, saying: 'But the congress may by law vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law or in the heads of departments.' Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official. To so hold would render void any and every delegation of power to an inferior to perform under any circumstances or exigency the duties of a superior officer, and the discharge of administrative duties would be seriously hindered. The manifest purpose of congress in classifying and defining the grades of consular offices, in the statute to which we have referred, was to so limit the period of duty to be performed

---

[58] *Id.* at 338, 340-41.

[59] *Id.* at 331-34.

by the vice consuls, and thereby to deprive them of the character of 'consuls,' in the broader and more permanent sense of that word.[60]

Thus, history makes clear that the Constitution permits statutes like the FVRA authorizing temporary acting service for positions that normally must be appointed by the President and confirmed by the Senate.

Bauer argues, however, that the length and circumstances of Berryhill's acting service renders it unconstitutional. The parties agree that the FVRA authorized Berryhill's acting service for 300 days initially, and I have found that Berryhill could continue to serve after Saul's nomination on April 17, 2018. Thus, Berryhill had served as the Acting Commissioner under the FVRA for 390 days (a little more than a year) at the time she ratified the ALJ's appointment on July 16, 2018.[61] Bauer argues that the FVRA is unconstitutional to the extent it allowed Berryhill to serve for 390 days with no exigencies present.

Bauer suggests that acting service longer than the 310 days upheld in *Eaton* would violate the Constitution, pointing to language in *Eaton* that the acting service was "under special and temporary conditions."[62] Bauer argues that "temporary" for purposes of the Appointments Clause means "appointed essentially to accomplish a single task," relying

---

[60] *Id.* at 343.

[61] Bauer argues that the court should consider that Berryhill led the Social Security Administration from January 20, 2017, to the time of her ALJ ratification on July 16, 2018, for a total of 542 days; or that at the very least, that Berryhill used the "Acting Commissioner" title from January 20, 2017, until the day after the issuance of the GAO letter, and then again from the time of Saul's nomination to the ratification, for a total of 509 days. In considering Bauer's argument that the FVRA is unconstitutional, I decline to consider acting service unauthorized by the FVRA. In any event, the analysis would remain the same even if Berryhill had served for a longer time period.

[62] *Id.*

23

on the Supreme Court's decision in *Morrison v. Olson*.[63] *Morrison* did not address acting service; rather, in that case, the Court analyzed whether a special counsel appointed to conduct a specific investigation was a principal or inferior officer for purposes of the Appointments Clause.[64] Bauer's proposed definition of "temporary" also conflicts with *Eaton*, which upheld acting service of all the functions and duties of a principal officer while the position was vacant.

Bauer also suggests that the Appointments Clause authorizes acting service only under "special conditions" like in cases of sudden death or illness; thus, Bauer argues the FVRA is unconstitutional to the extent it authorizes acting service when a vacancy is created due to resignation. But the early statutes Bauer relies on (that authorized acting service in cases of death or illness) also allowed acting service when the principal officer was "absen[t] from the seat of government."[65] In addition, the Federal Circuit recently rejected the argument that the "special conditions" mentioned in *Eaton* were not present when the vacancy existed because of the principal officer's resignation (and found 268

---

[63] 487 U.S. at 672.

[64] *Id.* at 670-71.

[65] *See, e.g.*, **Boyle v. United States**, 1857 WL 4155, at *3, *7 (Ct. Cl. Jan. 19, 1857) (upholding 466 days of acting service at various times over seven and a half years, with longest single period of 95 days; the court held that the acting Secretary of the Navy was an inferior officer, distinguishing that position from the Secretary, a principal officer: "The office of Secretary ad interim is temporary in its character, whilst that of Secretary is of a more permanent nature. The latter is emphatically the head of his department, whilst the former is only authorized to perform the duties of the Secretary in case of his death, absence from the seat of government, or sickness, until a successor be appointed, or until such absence or inability by sickness shall cease. The one may be considered inferior to the other. The relation in which they stand to each other is somewhat analogous to that of principal and deputy, especially in this, that the Secretary ad interim can perform all the duties of Secretary, and yet is not Secretary.").

Case 6:21-cv-02008-KEM   Document 31   Filed 07/25/22   Page 24 of 37

days of acting service constitutional, citing *Eaton*).[66]  And as a court in the D.C. District has noted, when the Supreme Court "has . . . reaffirmed *Eaton*, . . . it has described *Eaton*'s holding in durational terms."[67]

Bauer relies on Justice Thomas's concurrence in *NLRB v. SW General, Inc*.[68]  In that case, the general counsel of the NLRB (a principal officer) resigned in June 2010, and the President directed Lafe Solomon to serve as general counsel on an acting basis.[69] In January 2011, the President nominated Solomon as general counsel permanently, and after the Senate returned the nomination in January 2013 without action, the President resubmitted the nomination.[70]  Eventually, the President withdrew the nomination and submitted a new name, who was confirmed in October 2013.[71]  The issue before the Court was whether the FVRA authorized Solomon's acting service while his own nomination was pending; the Court held it did not.[72]  Justices Sotomayor and Ginsburg disagreed and would have upheld Solomon's acting service.[73]  Justice Thomas concurred to explain his view that the dissent's interpretation would likely violate the Appointments

---

[66] ***Arthrex, Inc. v. Smith & Nephew, Inc.***, 35 F.4th 1328, 1335 (Fed. Cir. 2022).  I note that in addressing the application of the FVRA, the court in *Arthrex* ultimately held the action taken was a "delegable duty" such that the FVRA did not apply, ***id.*** at 1335, but the court's Appointment Clause ruling did not appear to rest on that basis.

[67] ***Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives***, 356 F. Supp. 3d 109, 147 (D.D.C. 2019), *aff'd*, 920 F.3d 1 (D.C. Cir. 2019) (declining to address Appointments Clause argument based on subsequent ratification by principal officer).

[68] 137 S. Ct. 929.

[69] ***Id.*** at 937.

[70] ***Id.***

[71] ***Id.***

[72] ***Id.*** at 937-38.

[73] ***Id.*** at 949 (Sotomayor, J., concurring).

Clause.[74] Justice Thomas reasoned that "[w]hen the President directs someone to serve as an officer pursuant to the FVRA, he is appointing that person as an officer of the United States within the meaning of the Appointments Clause."[75] Justice Thomas suggested that because the general counsel of the NLRB is likely a principal officer, "the President likely could not lawfully have appointed Solomon to serve in that role without first obtaining the advice and consent of the Senate."[76] Justice Thomas stated in a footnote:

> That Solomon was appointed "temporarily" to serve as *acting* general counsel does not change the analysis. I do not think the structural protections of the Appointments Clause can be avoided based on such trivial distinctions. Solomon served for more than three years in an office limited by statute to a 4-year term, and he exercised all of the statutory duties of that office. There was thus nothing "special and temporary" about Solomon's appointment [distinguishing *Eaton*].[77]

Justice Thomas appeared to call any acting service into question, but this court cannot overrule Supreme Court precedent. The views of one justice are not binding on this court and are particularly unpersuasive when it appears two other justices disagreed (the dissenters, who would have upheld three years of acting service). And to the extent Justice Thomas was troubled by the length of Solomon's acting service, here, Berryhill's acting service is distinguishably shorter (a little more than a year in a position with a six-year term).[78]

---

[74] *Id.* at 945 (Thomas, J., concurring).

[75] *Id.* at 946 (cleaned up).

[76] *Id.* at 948.

[77] *Id.* at 946 n.1 (citations omitted).

[78] I do note, however, that here, the Commissioner position had been vacant for much longer than the general counsel position in *SW General* (here, more than five years; in *SW General*, more than three years).

Bauer's best support comes from historical practice and the early statutes limiting acting service to six months or thirty days. But *Eaton* upheld a longer length of service—310 days. In addition, a recent law review article notes that John Jay served as the Acting Secretary of State "at the request of [President] Washington" for almost a year, from April 30, 1789, until March 22, 1790, when Thomas Jefferson took over.[79] Thus, acting service was not as limited historically as Bauer contends.

Bauer does not cite to a single case in which a court has struck down a statute authorizing acting service as violating the Appointments Clause.[80] And in the few cases

---

[79] U.S. Government Printing Office, *Biographical Directory of the American Congress, 1774-1961*, **H.R. Doc. No. 86-442**, at 13 (1961) (cited in **Nina A. Mendelson**, *The Permissibility of Acting Officials: May the President Work Around Senate Confirmation?*, 72 Admin. L. Rev. 533, 582 & n.255 (2020)).

[80] Two recent law review publications argue that lengthy service under the FVRA would violate the Appointments Clause. The Mendelson law review article argues that "the FVRA's 'starter' period of 210 days" violates the Appointments Clause and advocates that courts impose a thirty-day limit on acting service for Cabinet Secretaries and a 120-day limit on acting service for other principal officers. **Mendelson**, *supra* note 79, at 601-03. There is no support in the text of the Appointments Clause to treat some principal officers differently from others, and Mendelson's position conflicts with both historical practice and *Eaton*.

A note in the Yale Law Journal argues that acting appointments that are "effectively permanent" violate the Appointments Clause and suggests that in determining where to draw the line, courts could analogize to the Recess Appointments Clause. **E. Garrett West**, *Congressional Power over Office Creation*, 128 Yale L.J. 166, 216-18 (2018) (Note). The Recess Appointments Clause allows the President to make temporary appointments during a Senate recess that, by its terms, "shall expire at the End of their next Session." **U.S. Const. art. II, § 2, cl. 3**. The Supreme Court noted in *NLRB v. Noel Canning* that a recess appointment "made at the beginning or in the middle of a formal session could permit the appointee to serve for 1 ½; or almost 2 years (until the end of the following formal session)." 573 U.S. 513, 534 (2014). The note thus suggests that acting service longer than two years violates the Appointments Clause. **West**, *supra*. Here, at the time of Berryhill's ratification, she had served under the FVRA for a little more than a year (and had led the Social Security Administration for less than two years) (although the vacancy had existed for more than five years). In addition, two courts have rejected the argument that the Appointments Clause should be treated like the Recess Appointments Clause:

27

in which a party has argued that lengthy acting service violated the Appointments Clause, courts have either rejected the argument[81] or found it to be a nonjusticiable political question.[82]   Courts that have disposed of the argument on justiciability grounds have

> [R]ecess appointees are not analogous to acting officers. When making a recess appointment, the President has unlimited authority; he can appoint anyone of his choosing with no oversight whatsoever. This power extends even beyond the Executive Branch to include Article III judgeships.   The *sole* limit on this extraordinary authority over two of the three branches of government is temporal. The same cannot be said of acting officers. Congress has the power to control the President's choice of acting officers—which, by their very nature, are limited to the Executive Branch.   In this case, for example, the President's choice was severely circumscribed: He was required to choose an acting director from among [the Federal Housing Finance Agency's] three deputy directors.   This is simply not comparable to the ability of a President to make a recess appointment with no restrictions or oversight whatsoever.
>
> Importantly, if Congress perceives that the President is abusing his limited power to appoint acting officers, Congress has the ability to address the problem through legislation. But Congress cannot limit the President's constitutionally granted power under the Recess Appointments Clause. The unlimited constitutional power to make recess appointments is therefore unlike the limited statutory power to designate acting officers.

**Bhatti v. Fed. Hous. Fin. Agency**, 332 F. Supp. 3d 1206, 1221 (D. Minn. 2018), *aff'd in part, rev'd in part,* 15 F.4th 848, 853 (8th Cir. 2021) (not addressing Appointments Clause argument since challenged rule was later ratified by Senate-confirmed officers and therefore plaintiff would not be entitled to any relief for Appointments Clause violation); *see also* **Rop v. Fed. Hous. Fin. Agency**, 485 F. Supp. 3d 900, 942-43 (W.D. Mich. 2020), *appeal filed*, No. 20-2071 (6th Cir. Oct. 30, 2020) (the Sixth Circuit heard oral argument in June 2022).

[81] *See Arthrex*, 35 F.4th at 1335 (rejecting argument that acting service for 268 days violated Appointments Clause); *Casa de Maryland*, 486 F. Supp. 3d at 943, 955-56 (rejecting argument that agency-specific succession statute that set forth no time limits on acting service "raise[d] serious constitutional doubts" such that the FVRA's time limits should be read into the statute when acting officer issued rules 226 days into his acting service and 443 days after the last principal officer had resigned (another acting officer served in the interim)).

[82] *Rop*, 485 F. Supp. 3d at 940, 942-43 (when plaintiff argued that agency director's acting service for almost three years under agency-specific statute violated the Appointments Clause, court held that determination of when initially valid acting service became unreasonable under the Appointments Clause was a nonjusticiable political question); *Bhatti*, 332 F. Supp. 3d at

reasoned that determining when an initial valid appointment becomes unreasonable under the Appointments Clause "is not a judicially discoverable or manageable standard":

> Applying [a reasonableness] standard would require a judge to assess the functioning of the entire Executive Branch and the changing state of the nation (actually, the world) throughout the length of the acting officer's tenure to determine at what point, if ever, the length of the officer's service became unreasonable. These assessments are far outside the competency of the judiciary and would require delving into areas—such as "the President's ability to devote attention to the matter" and his "desire to appraise the work of an Acting Director"—that are not normally the subject of judicial inquiry. Moreover, these assessments would involve "initial policy determination[s] of a kind clearly for nonjudicial discretion."[83]

Like other courts, I decline to strike down Berryhill's service under the FVRA as violative of the Appointments Clause based on its length.

## 2. *May Acting Officers Who Are Not Principal Officers Appoint Inferior Officers?*

Bauer argues that the specific action that Berryhill took here—ratifying the appointment of improperly appointed ALJs—violated the Appointments Clause. Bauer argues that the Appointments Clause does not authorize inferior officers (like Berryhill) to appoint other inferior officers (like ALJs); rather, according to Bauer, the Appointments Clause contemplates the appointment of inferior officers only by principal officers subject to Senate confirmation.

---

1218-21 (same; acting service for more than four years). These courts distinguished *Eaton* as challenging the initial appointment (as opposed to whether and when valid acting service becomes unconstitutional, which they found to be nonjusticiable).

[83] *Bhatti*, 332 F. Supp. 3d at 1218.

The Appointments Clause states that Congress may "vest the appointment of . . . inferior Officers . . . in the Heads of Departments."[84] Department heads are ordinarily principal officers who have been nominated by the President and confirmed by the Senate (including the Commissioner of Social Security). Acting officers filling principal-officer roles temporarily remain inferior officers—which is why temporary acting service without Senate confirmation does not violate the Appointments Clause.[85] The issue here is whether a "Head[] of Department[]" for purposes of the Appointments Clause includes inferior officers performing the "functions and duties" of the vacant department head position "temporarily in an acting capacity."[86]

Bauer relies on *United States v. Arthrex, Inc.*, in which the Supreme Court stated "that the exercise of executive power by inferior officers must at some level be subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate."[87] The Court in *Arthrex* was not addressing the power of acting officers, however. Bauer argues that requiring acting officers to be supervised by a principal officer is consistent with *Eaton*, since the Court in that case noted that the acting officer had executed bonds under instructions from the State Department or with later approval from the State Department.[88] But as other courts have noted, the Supreme Court in *Eaton*

---

[84] **U.S. Const. art. II, § 2, cl. 2**.

[85] *Eaton*, 169 U.S. at 343; ***United States v. Smith***, 962 F.3d 755, 7603 (4th Cir. 2020), *cert. denied,* 141 S. Ct. 930 (2020).

[86] *See* **5 U.S.C. § 3345(a)**.

[87] 141 S. Ct. 1970, 1988 (2021).

[88] *See* 169 U.S. at 333.

upheld acting service based on its temporary nature, not because there was supervision by a principal officer.[89]

　　If anything, *Arthrex* may provide some support for the Government's position. In that case, the Supreme Court held that patent judges appointed by the department head as inferior officers were actually principal officers, since their decisions were insulated from review by the department head.[90] To remedy this violation of the Appointments Clause, the Supreme Court invalidated the statute that prevented the department head from exercising discretion to review the patent judge's decisions (thus rendering the patent judges inferior officers).[91] The Supreme Court concluded "that the appropriate remedy is a remand to the Acting Director for him to decide whether to rehear the petition," noting this "limited remand to the Director provides an adequate opportunity for review

---

[89] *See **Arthrex***, 35 F.4th at 1334-35; ***Guedes***, 356 F. Supp. 3d at 145-48. Bauer also cites to *Silver v. United States Postal Service*, 951 F.2d 1033, 1037-38, 1040-41 (9th Cir. 1991) (per curiam), which rejected an Appointments Clause challenge to a statutory scheme vesting the power to appoint an inferior officer jointly in nine principal officers who headed the post office as a board, as well as an inferior officer they hired and could remove. Bauer argues *Silver* shows inferior officers have appointment power only when supervised by principal officers. I disagree. *Silver* could also be read as supporting that inferior officers may exercise some appointment power consistent with the Appointments Clause. And regardless, *Silver* did not address acting service. *See also* The Constitutional Separation of Powers Between the President and Congress, **20 Op. O.L.C. 124**, 152 n.82 (1996) (reasoning that *Silver*'s conclusion "might be justified on either of two rationales": (1) "it may be that there is no constitutional objection to designating one or more inferior officers to be the head of a department with the power to make appointments" (but noting the issue is unresolved), or "(2) [i]t might be argued that although as a general matter the head of a department must be a principal officer and a collective head of department must consist of exclusively principal officers, the association of an inferior officer with a collective head of department in making a specific appointment is constitutionally harmless").

[90] 141 S. Ct. at 1981, 1985.

[91] *Id.* at 1987.

by a principal officer," as required by the Appointments Clause.[92]  Thus, the Supreme Court appeared to acknowledge that an act required by the Appointments Clause to be performed by a principal-officer department head could be satisfied by an acting officer. And indeed, after remand to the agency and the acting director's denial of rehearing, the Federal Circuit rejected the argument that the Appointments Clause was violated because it requires a principal officer to issue the final agency decision, noting that under *Eaton*, "an inferior officer may temporarily perform an absent PAS officer's duties without violating the Appointments Clause."[93]

The Supreme Court has never addressed whether inferior officers may appoint other inferior officers (whether through acting service or otherwise).  In a concurrence addressing whether military judges were principal or inferior officers, Justice Souter noted that *Freytag* suggested Article I Tax Court judges "are principal officers . . . (since, *Freytag* held, Tax Court judges may appoint inferior officers)."[94]  But then Justice Souter noted analogizing military judges to Tax Court judges "proves nothing if Tax Court judges are inferior officers, which they may be."[95]  Justice Souter recognized that "though *Freytag* holds that the Tax Court is a 'Cour[t] of Law' that can appoint inferior officers, it may be that the Appointments Clause envisions appointment of some inferior officers by other inferior officers."[96]  Justice Scalia noted in his own concurrence that the Court "wisely avoided" the "complex" issues discussed by Justice Souter that were not

---

[92] *Id.* at 1987-88.

[93] 35 F.4th at 1333-34.

[94] *Weiss v. United States*, 510 U.S. 163, 191-92 (1994) (Souter, J., concurring).

[95] *Id.* at 192.  At the time of the *Freytag* decision, Tax Court judges were required by statute to be appointed by the President and confirmed by the Senate.  **26 U.S.C. § 7443(b)** (1988).

[96] *Id.* at 192-93.

argued—"namely, whether the Appointments Clause permits conferring principal-officer responsibilities upon an inferior officer in a manner other than that required for the appointment of a principal officer (and, if not, whether the responsibilities of a military judge are those of a principal officer)."[97]

In *NLRB v. Noel Canning*, the Supreme Court noted in dicta that "[a]cting officers may have less authority than Presidential appointments."[98] In support for that proposition, the Court cited a 1982 opinion from the Office of Legal Counsel opining that acting officers may serve indefinitely and "ha[ve] the same legal authority as a presidential appointee," but nonetheless encouraged the President to go through the Senate confirmation process, noting "as a practical matter," the stature of acting officers "is often somewhat inferior," and they are "frequently considered merely a caretaker without a mandate to take far-reaching measures."[99]

Neither of these Supreme Court decisions shed much light on how this issue should be resolved. Two courts in this district have rejected the argument that "Berryhill was an inferior officer who did not have the power to appoint other inferior officers," noting nothing in *Eaton* "prevented [Berryhill] from performing all the duties of the Commissioner while acting in that capacity."[100] And the D.C. Circuit held in *In re Grand*

---

[97] *Id.* at 197 n.* (Scalia, J., concurring).

[98] 573 U.S. at 541.

[99] Acting Officers, **6 Op. O.L.C. 119**, 121 (1982).

[100] ***Ferrin v. Saul***, No. 19-CV-4010-LLR, 2020 WL 1979754, at *15-17 (N.D. Iowa Apr. 8, 2020), *report and recommendation adopted*, 2020 WL 1976297 (Apr. 24, 2020) (clear-error review); *accord* ***Reuter v. Saul***," No. 19-CV-2053-LLR, 2020 WL 6161405, at *5-6 (N.D. Iowa Oct. 21, 2020) (adopting report and recommendation); *see also* ***Heins v. Saul***, No. 19-CV-2043-LTS, 2020 WL 6052583, at *20-21 (N.D. Iowa June 11, 2020), *report and recommendation adopted*, 2020 WL 4369450 (July 30, 2020) (clear-error review); ***Austin v. Saul***, No. 19-CV-3017-CJW, 2020 WL 5229540, at *14-16 (N.D. Iowa May 12, 2020), *report and recommendation adopted*, 2020 WL 3100838 (June 11, 2020) (finding Appointments Clause

*Jury Investigation* that the Acting Attorney General constituted the department head for Appointments Clause purposes and could therefore appoint special counsel, an inferior officer, when the Attorney General had recused himself from the investigation.[101]   A court in the D.C. District distinguished *In re Grand Jury Investigation*, however, because in that case, the Deputy Attorney General, who is appointed by the President with the advice and consent of the Senate, served as the Acting Attorney General.[102]   The Deputy Attorney General's statutory duties include "heading the Department of Justice in the Attorney General's absence," so at the time of the Deputy Attorney General's confirmation, he had "been selected for an office that, at least at times, constitutes the senior position in the Department of Justice."[103]   Thus, the district court reasoned the acting officer in *In re Grand Jury Investigation* was "almost certainly serv[ing] as a principal officer," so that case did "not answer the question whether inferior officers can appoint other inferior officers."[104]  But the D.C. Circuit in *In re Grand Jury Investigation* did not appear to rely on this distinction.

---

challenge forfeited); ***Marion v. Saul***, No. 19-CV-76-LRR, 2020 WL 2482124, at *24-27 (N.D. Iowa Apr. 21, 2020), *report and recommendation adopted*, 2020 WL 2475579 (May 13, 2020) (clear-error review).  A court in the District of New Mexico has also rejected the argument that the ALJ "should have been appointed by a Senate-confirmed Commissioner pursuant to the Appointments Clause and *Lucia*," noting that the FVRA "permitted Berryhill to exercise the authority of the office of the Commissioner, including the appointment of ALJs"; but I note in that case, the plaintiff offered "no support for his apparent position that Berryhill's acting status left her unable to perform these duties of Commissioner."  ***Dante v. Saul***, No. CV 20-0702 KBM, 2021 WL 2936576, at *7 (D.N.M. July 13, 2021)

[101] 916 F.3d 1047, 1056 (D.C. Cir. 2019).

[102] ***Nw. Immigrant Rts. Project v. U.S. Citizenship & Immigr. Servs.***, 496 F. Supp. 3d 31, 66-67 (D.D.C. 2020).

[103] ***Id.***

[104] ***Id.*** at 66.

In *Northwest Immigrant Rights*, a court in the D.C. District analyzed whether an acting officer may serve as a department head for purposes of the Appointments Clause but ultimately declined to "resolve this difficult constitutional question."[105]  In that case, a parade of acting officers had repeatedly served as the Department of Homeland Security Acting Secretary for a short period of time and then appointed their successor based on a statute authorizing the Secretary to create a succession order for Acting Secretaries.[106] Many of the court's concerns—such as the diffusion of appointment power to a potentially unlimited number of people—were specific to the facts of that case.[107]  The court suggested that the Framers did not intend "Heads of Departments" to include inferior officers, citing evidence that James Madison contemplated there are principal officers who are not department heads and suggested they be allowed to appoint inferior officers in some cases (which was not adopted by the Constitution).[108]  But whether a single department contains multiple principal officers sheds no light on whether there are circumstances in which inferior officers may appoint other inferior officers.  And that the Framers sought to limit appointment power to department heads says nothing about whether department heads include acting department heads.  As the court in *Northwest Immigrant Rights* noted, the text of the Appointments Clause supports the contrary position:

> In the most literal of terms, one can argue that such an official is, for all intents and purposes, the "Head of Department." *See* [*Free Enterprise*

---

[105] *Id.* at 69.

[106] *Id.* at 54-55.

[107] *Id.* at 65, 68.

[108] *Id.* at 65.

Case 6:21-cv-02008-KEM   Document 31   Filed 07/25/22   Page 35 of 37

*Fund*, 561 U.S. at 513] (quoting the Classification Act of 1923, which provides that "the head of the department" means "the officer or group of officers . . . who are not subordinate or responsible to any other officer of the department").[109]

Here, Berryhill (and any acting officer under the FVRA, other than the first assistant) must be appointed by the President. And under the FVRA, Congress expressly vested Berryhill, as the President's appointee, to "perform the functions and duties of the office."[110] As the court noted in *Northwest Immigrant Rights*, the Supreme Court has "observed that acting officials may exercise all the powers of the office in which they are serving" when "expressly empowered" by statute "to 'perform the duties' of the office."[111] The Commissioner's powers include the ability to appoint ALJs, inferior officers. And I see no reason why an Acting Commissioner should not be considered a "Head[] of Department" for purposes of the Appointments Clause, especially to the extent that first assistants meet this definition.

The Appointments Clause authorizes acting service, which necessarily empowers acting officers to take action that would otherwise violate the Appointments Clause if not performed by a "Head[] of Department[]" (e.g., promulgating rules; issuing final agency decisions). I find no reason to distinguish between these actions and the appointment of inferior officers. Through her position as Acting Commissioner of the Social Security Administration, Berryhill served as a department head, and her ratification of the ALJ's appointment here did not violate the Appointments Clause.

---

[109] *Id.* at 69.

[110] **5 U.S.C. § 3345(a)**.

[111] 496 F. Supp. 3d at 68.

Case 6:21-cv-02008-KEM   Document 31   Filed 07/25/22   Page 36 of 37

## II.    CONCLUSION

Bauer raises complex and novel arguments on the interpretation of the FVRA and particularly, the Appointments Clause.  Ultimately, I decline to be the first court to strike down the FVRA as unconstitutional, and I find Berryhill's acting service and ALJ appointment in accord with the FVRA.[112]

**SO ORDERED** on July 25, 2022.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[112] Because I ultimately resolve the merits of Bauer's arguments in the Government's favor, I decline to address the Government's forfeiture argument.

I also decline to address the Government's argument that no remedy exists for any Appointments Clause violation under the de facto officer doctrine; I note that the Supreme Court suggested the de facto officer doctrine does not save actions taken by an unconstitutionally appointed ALJ (hired by lower-level staff as an employee), *see Carr v. Saul*, 141 S. Ct. 1352, 1362 (2021); *Lucia*, 138 S. Ct. at 2055; but that the Eighth Circuit has applied the doctrine to uphold actions taken by an acting department head whose initial appointment was valid but who plaintiffs argued served for an unconstitutionally long time, *Bhatti*, 15 F.4th at 852-53.

37