IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| ARDEN B., <br><br>    Plaintiff, <br><br> vs. <br><br> KILOLO KIJAKAZI, <br> Acting Commissioner of Social Security, <br><br>    Defendant. | Case No. 21-CV-2008-KEM <br><br> **MEMORANDUM OPINION AND ORDER** |

Claimant seeks judicial review of a final decision of the Commissioner of Social Security denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Claimant argues that the administrative law judge (ALJ) erred in evaluating the medical opinions and her subjective complaints, resulting in a residual functional capacity (RFC) unsupported by substantial evidence. I **reverse** the Commissioner's decision and **remand** for further proceedings.

## I.    BACKGROUND[1]

Claimant served in the army right after high school, from June 2007 to December 2010. AR 246;[2] Doc. 19. Her military service has been her only full-time employment that lasted long enough to constitute substantial gainful activity. She served in the army reserves from 2011 through 2016 and attended college, graduating with a Bachelor's

---

[1] For a more thorough overview of the treatment records, see the Joint Statement of Facts (Doc. 19).

[2] "AR" refers to the administrative record below, filed at Docs. 14-2 to 14-11 and Doc. 18.

degree in criminal justice and sociology in April 2016. AR 282-85, 550, 678, 903. While in college, she worked part-time retail jobs for less than a year each. AR 282-85, 753. Upon graduation, she obtained employment as a security guard but quit after five months; she later reported (as part of a review to obtain benefits) that she quit because she got angry with people stealing things and was given written warnings. AR 677-79, 753. She also worked a part-time retail position for a few months during the summer of 2017; she said afterward her back pain prevented her from lifting gallons of paint to stock shelves and from standing to be a cashier. AR 328-29, 371, 600, 678-79. She reported working part-time as a job coach in the summer of 2018 for a few months, as well as briefly working a few hours a week in 2019 caring for a child with attention deficit hyperactivity disorder (ADHD). AR 282-85, 328, 330, 337, 1051-52. Claimant believed she could not use her degree to become a police officer because she would not pass the physical examination. AR 605.

Beginning in July 2014, Claimant received partial disability benefits from the Department of Veterans Affairs (VA)—the VA found her to have a 60% service-connected disability, with 20% related to her left shoulder, 10% related to her back, and 30% related to her post-traumatic stress disorder (PTSD) and depression. AR 246-47. Effective September 2017 (and granted in November 2017), the VA increased Claimant's disability rating related to her mental health, and she was granted full VA disability benefits. *Id.* Claimant was in school for photography at the time through VA vocational rehabilitation services, but she reported she would not be finishing the semester based on the award of benefits. AR 597, 600.

Claimant has been married several times (she receives more money from the VA when married (AR 1049)). She married twice while in the military, with both marriages ending in divorce after they began living apart from one another. AR 579. Shortly after her discharge, she married again and had a baby in 2011; they divorced in early 2015, and she became the sole parent to their son. *Id.*; AR 584, 752. In June 2016, she

2

reported "struggling" in her new relationship with someone she met online and needing couples counseling; she also reported trying to get pregnant. AR 752, 757. Claimant sought fertility treatment in August 2017, noting that she became pregnant in June 2016 but suffered a miscarriage at 10 weeks and that she had a "chemical pregnancy" earlier in 2017; it was noted these pregnancies involved a different partner than her current boyfriend. AR 540, 608-10. She suffered another miscarriage in September 2017, and a month later, her brother, who she was very close to, committed suicide. Doc. 19. In October 2017, Claimant stated she was in a new relationship after her last one ended violently (she suffered bruised ribs and shins and noted an upcoming court date); the next month, she indicated she was engaged with an October 2018 wedding planned. AR 556, 597, 677-78. In early May 2018, she stated she had recently moved in with a friend and begun to date her ex-husband and father of her child. AR 585-86. In mid-July 2018, Claimant reported living with a new boyfriend (not her ex-husband) for the past three months on his family farm; they attended couples therapy together in October 2018. AR 563-64, 577-79. In early 2019, Claimant moved to South Dakota to live with a new beau of a few months (and continued trying to conceive). Doc. 19; AR 550, 557. By mid-April, Claimant had moved in with her mother near Orange City, Iowa, and she reported reconnecting with an ex-boyfriend, who she planned to marry in July. AR 455, 457, 459, 1069. By early May 2019, Claimant was renting an apartment near Waterloo, Iowa, and she was pregnant. AR 540, 832, 1069. Her relationship with the baby's father did not last long: in early May 2019, Claimant called the police and obtained a restraining order after her boyfriend chased her around with an axe; and although she gave him another chance when he offered to care for her after she was in a motor vehicle accident, they quickly broke up again after he threw her against a brick wall in June. Doc. 19; 448, 540. By late August 2019, Claimant had purchased a home in the area, and she had married someone she knew from middle school who she had been dating for 45 days. AR 903. Claimant gave birth in late December 2019, and by March 2020, she had asked

her husband for a divorce. Doc. 19. Claimant's nine-year-old lived with Claimant's mother (five hours away) during the 2019-2020 school year, with Claimant seeing him on the weekends—Claimant did not want her son to change schools as the result of her moves, and she described her pregnancy as "rough." Doc. 19; AR 862, 992. But when the COVID-19 pandemic resulted in school going to a virtual format in March 2020, Claimant's son began living with her again. Doc. 19.

Claimant filed for Social Security benefits in March 2019, alleging a disability onset date in September 2017. Doc. 19. The Social Security Administration denied Claimant's application on initial review in August 2019 and on reconsideration in September 2019. AR 87-122. The ALJ held a telephonic hearing on April 1, 2020, at which Claimant and a vocational expert (VE) testified, and the ALJ held a supplemental hearing in June 2020 to clarify the VE's testimony. AR 12-27, 1040-76.

On August 7, 2020, the ALJ issued a written decision following the familiar five-step process outlined in the regulations,[3] finding Claimant not disabled from September 7, 2017, through the date of the decision. AR 31-42. The ALJ found Claimant suffered from the following severe impairments: PTSD, depression, anxiety, "status-post left shoulder surgery," and a spine disorder. AR 34. To determine whether Claimant could perform her past work (at step four) or other work (at step five), the ALJ determined Claimant's RFC:[4]

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." *King v. Astrue*, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004)).

[4] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019) (citing **20 C.F.R. § 404.1545(a)(1)**).

> [Claimant] has the [RFC] to perform light work . . . except: she has the ability to frequently balance and occasionally climb, stoop, kneel, crouch, and crawl. [She] can only occasionally reach overhead with the left upper extremity. She is limited to simple routine tasks with the ability to occasionally interact with co-workers and supervisors. She can have no work-related interaction with the public. [She] is able to adapt to only simple changes in a work setting.

AR 36.[5] Relying on VE testimony, the ALJ found that Claimant could not perform her past relevant work (as a transport operator for the military), but that a significant number of other jobs existed in the national economy that Claimant could perform, such as merchandise marker, photocopying-machine operator, folding-machine operator, and clerical collator operator. AR 1326. Accordingly, the ALJ concluded that Claimant was not disabled. *Id.*

Claimant appealed. The Appeals Council denied Claimant's request for review on December 3, 2020 (AR 1-3), making the ALJ's decision the final decision of the Commissioner.[6] Claimant filed a timely complaint in this court seeking judicial review of the Commissioner's decision (Docs. 1, 3).[7] The parties briefed the issues (Docs. 20-22)[8] and consented to the exercise of jurisdiction by a United States magistrate judge (Doc. 9).

---

[5] Light work requires the ability to lift and carry ten pounds frequently and twenty pounds occasionally, and to stand, walk, and sit (with normal breaks) for a total of about six hours in an eight-hour workday. **20 C.F.R. § 404.1567(b)**; **SSR 83-10**, 1983 WL 31251, at *5-6 (Jan. 1, 1983); *see also, e.g.*, **SSR 96-9p**, 61 Fed. Reg. 34478, 34480 (July 2, 1996). "Frequently" is a term of art meaning from one-third to two-thirds of an eight-hour day. *See, e.g.*, ***Dictionary of Occupational Titles (DOT)*, App. C**. "Occasionally" means "very little up to one-third" (or two hours) of an eight-hour workday. *See id.*; **SSR 96-9p, 61 Fed. Reg. 34478, 34480** (July 2, 1996).

[6] *See* **20 C.F.R. § 404.981**.

[7] *See* **20 C.F.R. § 422.210(c)**.

[8] Claimant raised a constitutional argument in supplemental briefing, which I disposed of by separate order. *See* Docs. 28-31.

5

## II.   DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole."[9]  "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."[10]  The court "do[es] not reweigh the evidence or review the factual record de novo."[11]  If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision."[12]

Claimant challenges the ALJ's reasons for finding three medical opinions unpersuasive.  Claimant also argues that "some medical evidence" does not support the ALJ's RFC determination and that the ALJ should have included a limitation allowing Claimant to work independently of others as needed.  Finally, Claimant argues that the ALJ erred in discounting her subjective complaints.

### A. Medical Opinions

For claims filed after March 2017 (like Claimant's), the ALJ no longer "assign[s] a specific weight to medical opinions."[13]  Instead, the ALJ "evaluate[s] the persuasiveness of medical opinions" considering the following factors:  (1) supportability, i.e., "the objective medical evidence and supporting explanations presented by a medical source" in support of his or her opinion; (2) consistency with "evidence from other medical sources and nonmedical sources"; (3) the relationship between the opinion's author and

---

[9] *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**.

[10] *Kirby*, 500 F.3d at 707.

[11] *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

[12] *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

[13] *Revisions to Rules Regarding the Evaluation of Medical Evidence*, **82 Fed. Reg. 5844**, 5858 (Jan. 18, 2017); *see also* **20 C.F.R. § 404.1520c(a)**.

the claimant, such as whether the opinion is from a treating source; (4) whether the medical opinion is by a specialist; and (5) "other factors that tend to support or contradict a medical opinion," such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Social Security Administration's] policies and evidentiary requirements."[14] The first two factors, supportability and consistency, are the most important.[15] The ALJ is required to "articulate how [the ALJ] considered the medical opinions" and "explain how [the ALJ] considered the supportability and consistency factors."[16]

Claimant challenges the ALJ's analysis of three medical opinions: a mental RFC opinion from treating VA psychologist Laura McDonald, PhD; and two opinions issued in connection with Claimant's claim for VA disability benefits after consultative examinations, one by psychiatrist Jeanette Oleskowicz, MD, and the other by staff physician Claudia Lorenzo-Perez, MD.

### 1. *Dr. McDonald*

Claimant began seeing Dr. McDonald for therapy once or twice a month beginning in October 2019, after Claimant had purchased her home and settled in the Waterloo area. Doc. 19. In March 2020, Dr. McDonald completed a form provided by Claimant's attorney. AR 1001-06. Dr. McDonald checked boxes indicating Claimant was seriously limited in accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers without unduly distracting them or exhibiting behavioral extremes, and in maintaining socially appropriate behavior; the form defined "seriously limited" as "noticeable difficulty (e.g., distracted from job activity) from 11

---

[14] **20 C.F.R. § 404.1520c(a), (c)**.

[15] **20 C.F.R. § 404.1520c(a)**.

[16] **20 C.F.R. § 404.1520c(a), (b)(2)**.

to 15 percent of the workday or work week." AR 1003-04. Dr. McDonald explained that Claimant has trouble managing anger and anxiety and acting appropriately around other people, noting she lashes out at people. AR 1004. In describing clinical findings supporting her opinion, Dr. McDonald opined that Claimant's PTSD impacted her social functioning and that she had a difficult time being around people, especially male authority. AR 1001. Dr. McDonald checked boxes indicating Claimant's symptoms included recurrent severe panic attacks, recurrent and intrusive recollections of a traumatic experience, persistent anxiety, mood disturbance, decreased energy, suicidal thoughts, impaired impulse control, and intense and unstable interpersonal relationships and impulsive and damaging behavior. AR 1002.

The ALJ found Dr. McDonald's opinions on Claimant's social functioning unpersuasive. AR 40. The ALJ explained:

> These opinions . . . are inconsistent with the claimant's activities, which included marrying, buying a house, and having a baby since the alleged onset date. In addition, it is also inconsistent with her presentation on exams in general and her relatively conservative treatment, which included no inpatient hospitalizations during the relevant time period.

*Id.*

Claimant argues that the ALJ committed legal error by failing to address the supportability factor, as required by the regulations. Claimant notes that in an unpublished per curiam opinion, the Eighth Circuit has held remand is required when "the ALJ adequately evaluated the supportability [of the medical] opinion" but "did not address whether [the] opinion was consistent with the other evidence of record, as required by the applicable regulation."[17] In that case, the ALJ said the following about the medical opinion in issue:

> Dr. Thompson's opinion is not persuasive. Although he has a long, treating relationship with the claimant, Dr. Thompson provides little support or

---
[17] *Bonnett v. Kijakazi*, 859 F. App'x 19, 20 (8th Cir. 2021).

> explanation for his opinion. In addition, his opinion is not consistent with his own examinations of the claimant. For example, his examinations show mostly normal strength and sensation with variable limits in lumbar range of motion. Furthermore, Dr. Thompson's treatment notes often report that the claimant's functionality and activities of daily living are improved with pain medication. Likewise, Dr. Thompson consistently reported the claimant appeared in no acute distress.[18]

Because the ALJ addressed only whether the source's own treatment records supported his opinion, the Eighth Circuit held remand was required for the ALJ to address consistency with the other evidence in the record. The court cited *Lucas v. Saul*, a case issued under the old regulations, in which the court held the failure to comply with Social Security regulations governing the analysis of medical opinions "is more than a drafting issue, it is legal error" that requires reversal.[19]

Here, the ALJ did not address the signs and symptoms Dr. McDonald stated supported her opinion. The Commissioner urges the court to affirm, arguing that Dr. McDonald's opinion relied on Claimant's subjective complaints and is contained on a checklist form, but as the Eighth Circuit noted in *Bonnett*, the court cannot affirm on alternative bases not found by the ALJ.[20] District courts in this circuit have held that when evaluating the persuasiveness of medical opinions, the ALJ's failure to address the supportability factor constitutes legal error that requires reversal.[21] I agree.

---

[18] ***Bonnett v. Comm'r, Soc. Sec. Admin.***, No. 1:20-cv-01032, 2021 WL 816945, at *3 (W.D. Ark. Mar. 3, 2021) (citations omitted) (underlying district court decision).

[19] ***Lucus v. Saul***, 960 F.3d 1066, 1069-70 (8th Cir. 2020).

[20] 859 F. App'x at 20 (citing ***SEC v. Chenery Corp.***, 318 U.S. 80, 87 (1943)).

[21] ***Lutz v. Kijakazi***, No. 4:20-CV-1140-SPM, 2022 WL 782300, at *5 (E.D. Mo. Mar. 15, 2022) ("[T]he ALJ's failure to explain her findings regarding the supportability of [medical] opinions constitutes legal error and requires remand."); ***Starman v. Kijakazi***, No. 2:20-cv-00035-SRC, 2021 WL 4459729, at *5 (E.D. Mo. Sept. 29, 2021) (collecting cases and holding "the ALJ's failure to consider the supportability of [the medical] opinion warrants remand."); ***Wilkins v.***

9

The ALJ erred by failing to address the evidence and explanations listed by Dr. McDonald as supporting her opinion. Remand is required for the ALJ to address the supportability factor.[22]

### 2. *Dr. Oleskowicz*

Dr. Oleskowicz examined Claimant in October 2017 in connection with Claimant's request for increased VA disability benefits. *See* Doc. 19. She concluded that Claimant "has significant social as well as occupational impairment and feels she will be unsuccessful when it comes to relationships in the future." *Id.* The ALJ found this opinion "too vague to be persuasive." AR 40.

Claimant argues that the ALJ failed to address supportability and consistency. But it is precisely because Dr. Oleskowicz's statement is so broad that the ALJ could not address it in any more detail. Like Dr. Oleskowicz, the ALJ found that Claimant suffers from significant social limitations, finding she could only work in jobs with occasional interaction with coworkers and supervisors and with no work-related interaction with the public. Is this more or less limited than Dr. Oleskowicz found Claimant? One cannot say. Under the old standards for evaluating medical opinions, the Eighth Circuit recognized that medical opinions containing "no specifics concerning [the claimant's] condition . . . . [are] of limited value due to [their] vagueness."[23] And district courts have continued to find that ALJs are entitled to discount vague medical opinions under

---

*Kijakazi*, No. 4:20-cv-00938 PSH, 2021 WL 3033343, at *3 (E.D. Ark. July 19, 2021) (holding that when ALJ discounted medical opinion as inconsistent with claimant's activities of daily living, remand was required for ALJ to fully address supportability and consistency factors).

[22] I also suggest that the ALJ rethink relying on Claimant's marriage during the relevant time period as a sign of her social functioning, without mentioning that Claimant had known her husband for only forty-five days and filed for divorce within six months (Dr. McDonald noted Claimant's unstable and impulsive relationships as a factor supporting her opinion).

[23] *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996).

the post-2017 standard.[24] Indeed, as one court has noted, the new regulations changed the definition of a medical opinion to focus on "what [the claimant] can still do" and "whether [the claimant] has one or more impairment-related limitations or restrictions" in the ability to perform the physical or mental demands of work.[25] Here, Dr. Oleskowicz's opinion does not set forth any specific functional abilities or restrictions.

In addition, an ALJ does not need to "provide any analysis . . . about a decision made by any other governmental agency . . . about whether [the claimant is] disabled, . . . employable, or entitled to any benefits."[26] Dr. Oleskowicz's statement that Claimant suffers "occupational impairment" is a general statement regarding Claimant's employability, and the ALJ did not have to consider it.

I do not find that the ALJ erred in addressing Dr. Oleskowicz's vague opinion.

### 3. Dr. Lorenzo-Perez

Like Dr. Oleskowicz, Dr. Lorenzo-Perez examined Claimant in October 2017 to determine her eligibility for VA disability benefits. *See* Doc. 19. Dr. Lorenzo-Perez found that Claimant's "back condition limited her ability to stand up for long periods of time." *Id*. The ALJ noted "[i]t is unclear how long the [VA] physician considers to be a 'long period'" and found this opinion "too vague to be instructive or persuasive." AR 39.

The ALJ did not include any limitations in Claimant's RFC related to standing, meaning the ALJ found Claimant could perform work that required standing all day with

---

[24] *See, e.g.*, **Steven S. v. Kijakazi**, No. CV 21-1201 (WMW/BRT), 2022 WL 2960009, at *9-10 (D. Minn. June 6, 2022), *report and recommendation adopted*, 2022 WL 2954033 (July 26, 2022) (clear-error review); **Murphy v. Kijakazi**, No. 1:20 CV 154 RWS, 2021 WL 3033404, at *7 (E.D. Mo. July 19, 2021).

[25] **20 C.F.R. § 404.1513(a)(2)**; *see Murphy*, 2021 WL 3033404, at *7.

[26] **20 C.F.R. § 404.1504**.

11

normal breaks every two hours.[27] However you define "long period," the ALJ's determination of Claimant's ability to stand seems likely to be in conflict with Dr. Lorenzo-Perez's opinion. But district courts have upheld the ALJ's decision to find a medical opinion unpersuasively vague when it used terms like "prolonged" rather than a definitive amount of time.[28]

In addition, the ALJ's overall discussion of the other medical opinions and treatment records supports the ALJ's determination related to Claimant's ability to stand. The ALJ found persuasive the opinions of the state agency medical consultants, who, like the ALJ, found that Claimant "could perform a wide range of light work." AR 96, 115. The ALJ credited these opinions over Dr. Lorenzo-Perez's "given [Claimant's] relatively conservative treatment, her presentation on exams, and her ability to perform activities of daily living such as exercising." AR 39.

As the ALJ noted, Claimant's treatment for back pain was fairly limited (the ALJ described it as "conservative and sporadic"). AR 38. In 2017, she attended a pain-management appointment in early September; underwent a CT[29] scan and x-ray in October (both normal); and participated in two physical therapy sessions in November. Doc. 19. She did not seek any further treatment for back pain until August and September 2018, when she visited the chiropractor. *Id.* Claimant did not seek treatment again until February 2019, when she asked her primary care provider for a chiropractor referral, noting adjustments had helped her pain in the past. AR 470. She visited the chiropractor once in early March 2019. Doc. 19. Then, once she was pregnant in May, Claimant began visiting the chiropractor regularly, noting she wanted to prevent the increase in back pain she had suffered during her first pregnancy. Doc. 19, AR 832; *see also* AR

---

[27] *See Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (noting "normal breaks" occur "at two hour intervals").

[28] *See Steven S.*, 2022 WL 2960009, at *10.

[29] Computed tomography.

12

883 (noting in August 2019 back pain worse with pregnancy). She also participated in physical therapy during her pregnancy. Doc. 19. After Claimant gave birth in late December 2019, she reported feeling better, with "occasional back pain that was not as bad as it used to be." AR 998. She visited the chiropractor twice in the first month after she gave birth and again in February 2020 but did not otherwise seek treatment for back pain (despite the record containing VA treatment notes through June 2020).

In addition to chiropractic treatment and physical therapy, Claimant used massages and a TENS unit to treat her pain (the latter of which she did not think was very effective at providing long-term relief), and she noted previously trying (and disliking) acupuncture. Doc. 19; AR 561, 570, 604-05, 791, 826, 832. She did not take any pain medications during most of the relevant time period, as she was focused on getting pregnant and did not want to affect her fertility or later, risk a miscarriage. Doc. 19; AR 570. After she gave birth, she reported occasionally taking ibuprofen but did not seek out additional pain medications. *See* 989, 1030; *see also* AR 601 (describing previous medications as of November 2017, noting that ibuprofen "helps sometimes, other times doesn't," and that Flexeril (cyclobenzaprine, a muscle relaxer) provides "good benefit").

The ALJ also noted that Claimant has "remained relatively active." AR 38. The record contains references to Claimant coaching her son's little league team, acting as a Boy Scout leader, packing and moving on multiple occasions, walking a mile a day, doing yoga, shopping, attending a concert, performing household chores, and helping with farm work. AR 38, 455, 457, 519, 525, 557, 569-70, 833, 908, 988, 1024. The ALJ could find Claimant's minimal limits in her activities of daily living inconsistent with a finding of disabling back pain.[30]

Here, viewing the ALJ's opinion as a whole, it is apparent why the ALJ found the opinions of the state agency consultants' more supported and consistent with the record

---

[30] *See* ***Goff v. Barnhart***, 421 F.3d 785, 792 (8th Cir. 2005).

and thus, more persuasive than Dr. Lorenzo-Perez's opinion (to the extent he opined Claimant could not stand as required for light work). I do not find that the ALJ's evaluation of Dr. Lorenzo-Perez's opinion requires reversal. As I am remanding for other reasons, however, the ALJ may find it prudent on remand to make clearer the ALJ's analysis of the consistency and supportability factors with regards to Dr. Lorenzo-Perez's opinion.

### B. *Some Medical Evidence*

Claimant relies on cases holding that "[RFC] is a medical question" that must be supported by "[s]ome medical evidence."[31] But although the ALJ found unpersuasive the only medical opinions in the record from *examining* sources, the record contained other medical opinions. Specifically, the ALJ explained why he found persuasive medical opinions issued by the state agency consultants in June and October 2018 based on their review of the treatment records. AR 1321, 2713-15, 2731-34; *see also* AR 64-67, 80-82. The ALJ may rely on nonexamining medical opinions when more consistent with the ALJ's review of the treatment records and other evidence of record.[32]

---

[31] ***Lauer v. Apfel***, 245 F.3d 700, 704 (8th Cir. 2001); *accord* ***Combs v. Berryhill***, 878 F.3d 642, 646 (8th Cir. 2017); ***Hutsell v. Massanari***, 259 F.3d 707, 711 (8th Cir. 2001); ***Nevland v. Apfel***, 204 F.3d 853, 858 (8th Cir. 2000).

[32] *See* ***Bowers v. Kijakazi***, 40 F.4th 872, 875-76 (8th Cir. 2022) (holding that ALJ did not err in relying on opinions of state agency physicians, who examined only the medical records and not the claimant, when their opinions that claimant could perform light work were more consistent with the objective medical evidence than the treating doctor's opinion; the objective medical evidence showed routine treatment every six months, mostly mild findings on imaging, and normal motor and neurological function); *see also* ***Kamann v. Colvin***, 721 F.3d 945, 948-51 (8th Cir. 2013) (rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ rejected the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist"). In addition, here, Claimant's mental functioning has largely remained stable throughout the relevant time

Claimant argues that the psychological RFC opinions issued by the state agency consultants support that Claimant is more limited than found by the ALJ. Thus, Claimant argues they do not constitute "some medical evidence" supporting the ALJ's RFC determination.

The state agency consultants opined that Claimant suffered moderate limitations in the following areas:

- The ability to work in coordination with or in proximity to others without being distracted by them;
- The ability to get along with coworkers without distracting them or exhibiting behavioral extremes;
- The ability to accept instructions and respond appropriately to criticism from supervisors; and
- The ability to interact appropriately with the general public.

AR 100-01, 117-18. In the narrative section, the state agency consultants concluded:

> Due to anxiety, [Claimant] would likely perform best in an environment with limited interpersonal demands. However, it appears she can maintain at least superficial social interaction when motivated to do so. The preponderance of the evidence supports that she is capable of performing at least simple, repetitive tasks, if she can work independent[ly] of others as needed.

AR 102, 119-20.

---

period, unlike in one of the cases relied upon by Claimant. *See* ***Noerper v. Saul***, 964 F.3d 738, 743-44, 746-47 (8th Cir. 2020) (holding that ALJ failed to develop the medical-opinion evidence when the ALJ relied on the claimant's primary care provider's characterization of her knee impairment, reflected in his treatment records, without resolving the differences in opinion reflected in the claimant's orthopedist's treatment records; and although the state agency consultant, like the ALJ, had found the claimant could be on her feet for six hours in an eight-hour day, this opinion "predated the majority of the treatment records concerning [the claimant's] knee conditions").

The ALJ found the state agency consultants' opinions persuasive, stating that moderate limitations in social functioning was consistent with Claimant's relatively conservative mental-health treatment and fairly unlimited activities of daily living. AR 39. Claimant argues that the ALJ erred in failing to adopt a limitation related to working independently of others, as found by the state agency consultants. At the very least, Claimant argues that the ALJ was required to explain the failure to include this limitation in the RFC determination. The ALJ limited Claimant to occasional interaction with coworkers and supervisors (i.e., up to one-thirds of the time) and no work-related interactions with the public. AR 36. The VE testified that this RFC would limit Claimant to positions "not dealing with people," per the DOT, and that do not involve public traffic or require tandem work, per the VE's opinion and experience. AR 1073-74. The VE's testimony makes clear that the jobs the ALJ found Claimant could perform would always allow her to work independently of others. Accordingly, I find that the ALJ's RFC is consistent with and supported by the opinions of the state agency consultants.

Claimant also cites cases recognizing that the ALJ has a duty "to develop the record fairly and fully."[33] But while the ALJ may be under an obligation to contact an examining source in certain instances,[34] no such duty exists merely because the ALJ finds the source's opined limitations vague.[35] I do not find that the ALJ's RFC determination

---

[33] *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004).

[34] *See Vossen v. Astrue*, 612 F.3d 1011, 1016-17 (8th Cir. 2010) (holding that when ALJ rejected consultative examiner's sitting and standing limitations as unauthentic, the ALJ should have further developed the record regarding the opinion's authenticity); *Snead*, 360 F.3d at 837-39 (holding that when the claimant had been hospitalized twice for congestive heart failure and his doctor provided a letter that his underlying heart condition rendered him disabled, the ALJ erred in concluding "no clinical documentation" supported that the claimant's heart condition would cause symptoms lasting for twelve months, as the record contained no evidence contradicting the doctor's opinion on the claimant's heart condition and the ALJ erred in failing to develop the record further on the claimant's heart condition).

[35] *Vossen*, 612 F.3d at 1016 (noting that ALJ does not have a duty to develop the record simply because a treating source's opinions "were unclear or lacked foundation"); *cf.* **Wildman v.**

16

was unsupported by "some medical evidence" or that the ALJ was otherwise required to order a consultative examination.

### C. Subjective Complaints

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions."[36] "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."[37] The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary"[38] or "inconsistencies in the record as a whole."[39] Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'"[40]

Claimant argues that the ALJ erred in failing to specifically mention the instances she claimed gave rise to her PTSD symptoms—she was assaulted during her time in the military, and she suffered instances of domestic violence, including in May 2019 when

---

*Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (holding that the ALJ may discount a treating source's opinion "when it consists of nothing more than vague, conclusory statements" (cleaned up) (quoting *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)).

[36] *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*, 804 F.2d 456 (8th Cir. 1986).

[37] *Black*, 143 F.3d at 386.

[38] *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

[39] *Brockman v. Sullivan*, 987 F.2d 1344, 1346 (8th Cir. 1993).

[40] *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (quoting *Hogan v. Apfel*, 239 F.3d 958, 962 (8th Cir. 2001)).

her significant other chased her around with an axe. But the ALJ discussed Claimant's PTSD symptoms as a result of these events (even if the ALJ did not mention these events specifically). The ALJ relied on Claimant's normal mental status examinations, extensive activities of daily living, and conservative mental-health treatment (including the failure to take psychiatric medications during most of the relevant time period, as she was trying to become pregnant and ultimately was successful). The record does reflect that Claimant suffered anger issues and difficulties getting along with people—she was arrested in 2015 for pepper spraying a woman in the Walmart parking lot who questioned her parenting abilities; she reported in December 2019 that after a woman cut her off in the McDonald's drive-through, she got out of her car and hit the woman's car with her hands while yelling; and she was irritable with providers on occasion. AR 518, 582-83, 605-06, 753, 888, 935. The ALJ accounted for Claimant's social issues, however, by restricting Claimant to jobs that limited her interactions with people. Substantial evidence supports the ALJ's failure to fully credit Claimant's subjective complaints.

## III. CONCLUSION

The Commissioner's decision is **reversed,** and this case is **remanded** to the Social Security Administration with instructions to further evaluate Dr. McDonald's RFC opinion. The clerk of court is directed to enter judgment in favor of the Claimant.

**SO ORDERED** on September 30, 2022.

*Kelly K.E. Mahoney*
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa